OPINION
This appeal is taken by Defendant-Appellant, Mindy A. Berenyi, from the judgment entered by the Court of Common Pleas of Allen County finding her guilty of aggravated murder and sentencing her to life imprisonment with the Ohio Department of Rehabilitation and Corrections.
On September 27, 1995, Mindy Ann Berenyi ("Mindy"), a sixteen year old high school student in Antwerp, Ohio arrived home from school at about 4:30 in the afternoon. Once inside her home, Mindy broke into her father's bedroom by pounding on the door until the lock was dislodged. Once inside his bedroom Mindy took a twelve (12) gauge shotgun from the room and took it into the bathroom at the front of the house where she remained until her father came home.
Mindy testified that she was feeling suicidal and had taken the shotgun intending to kill herself. She further testified that she went into the bathroom and sat in the shower because she did not want to make a mess when she killed herself.
Mindy's father, William A. Berenyi ("Andy"), arrived home from work at approximately 5:30 p.m. Upon entering the house Andy began calling for Mindy. Mindy, alone in the bathroom adjacent to the kitchen where the answering machine was located, yelled at Andy to check the messages on the answering machine. When Andy entered the kitchen to check the answering machine he crossed directly in front of the bathroom where Mindy was hiding. When Mindy opened the bathroom door she saw that Andy's back was turned to her and she shot him once in the back. Andy fell to the floor. Mindy rushed over to Andy crying hysterically and held him until he stopped breathing.
Mindy then returned to Andy's bedroom and opened Andy's gun cabinet with the keys she had taken from his dead body. Mindy removed a .357 Magnum. Mindy then proceeded to the garage and retrieved a pair of white work gloves. She put the gloves on. For an hour or more Mindy sat at her dining room table contemplating suicide but was unable to follow through.
About 7:30 p.m., Mindy's stepmother, Joni Berenyi ("Joni") arrived home from work. When Joni entered the home she noticed that Mindy had the .357 Magnum pointed at her own head. Mindy began ranting that she had killed her father and ordered Joni not to look at him. When Joni attempted to look at Andy's body, Mindy became hysterical. Joni tried emphatically to calm Mindy down. Within minutes after Joni's arrival Mindy noticed through the window that her grandmother, who lived behind their house, was walking towards their home. Mindy proceeded to lock all the doors and grabbed Joni's arm and led her into the bathroom. Mindy told Joni to be quiet or she would kill herself. The grandmother soon left after finding no one home.
Joni then spent the next hour trying to calm Mindy down. Joni and Mindy smoked a few cigarettes and then Joni asked Mindy if she wanted to talk to her social worker, Laura Alvarado, about what she had done and Mindy responded affirmatively. Joni and Mindy left the house and locked all the doors to prevent discovery of Andy's body and drove around talking while trying to locate the county jail where Joni assumed she would find Laura Alvarado, Mindy's social worker. At one point during the drive, Mindy tried unsuccessfully to convince Joni to go back to the house and help her make it look as if a burglary had taken place.
When they reached the jail, Mindy told the dispatcher that she had shot her father earlier that evening. According to Mindy and several other witnesses who testified on her behalf, she and her father had argued several times in the past and he had been physically abusing her for years. Mindy claims that when her father came home that evening she became scared. She had violated a rule of the house by taking one of his guns into the bathroom and she believed he surely would be angry. Mindy testified that she asked her father to check the answering machine so that she could leave the bathroom and return the gun to his bedroom unnoticed while his back would be turned away from her. But, as she left the bathroom, her father started to turn towards her. Mindy stated that she feared he would hurt or kill her and as every harsh word that he had ever said to her flashed through her mind, she shot him.
On September 28, 1995, Deputy Keith Baird filed a complaint in the Paulding County Court of Common Pleas, Juvenile Division, alleging that Mindy Berenyi, a juvenile, was a delinquent child who "did purposely cause the death of William A. Berenyi, in violation of Sections 2903.02(A) and 2151.02 of the Ohio Revised Code (Murder), a felony punishable pursuant to Section 2902.02(B) if committed by an adult."
On November 16, 1995, the State filed a motion to transfer jurisdiction of Mindy's case to the Paulding County Court of Common Pleas, General Division. Pursuant to R.C. § 2151.26
and Juv. R. 30, the juvenile court held a probable cause hearing on November 29, 1995 and an amenability hearing on March 20, 1996.
On May 20, 1996, after considerable review the court found that "there are reasonable grounds to believe that the juvenile, Mindy Ann Berenyi, is not amenable to care or rehabilitation" and " the safety of the community may require that Mindy Ann Berenyi be placed under legal restraint for a period extending beyond the child's majority" and thus, granted the State's motion to transfer to the General Division and thereafter relinquished the jurisdiction of the Juvenile Division.
On June 16, 1996, Mindy was indicted on one count of aggravated murder, a violation of R.C. § 2903.01(A). On July 12, 1996, the indictment was amended to include a firearm specification.
On December 9, 1996, pursuant to plea negotiations, Mindy entered a plea of no contest to the lesser charge of murder. Mindy was sentenced to the Ohio Department of Rehabilitation and Corrections for a period of fifteen years to life. Mindy appealed that judgment and sentence to this Court asserting five assignments of error. In her initial assignment of error Mindy asserted that the Juvenile Division of the Paulding County Court of Common Pleas had erred by failing to comply with Juv. R. 30(B) and R.C. § 2151.26 before transferring jurisdiction because she was not given a physical exam and thus, the Paulding County Court of Common Pleas, General Division lacked subject matter jurisdiction over Mindy's case.
On September 18, 1997, this court sustained that assignment of error and reversed the judgment of the Paulding County Court of Common Pleas. Further this court vacated Mindy's guilty plea because the trial court was without jurisdiction to enter it and remanded the case to the Paulding County Court of Common Pleas, Juvenile Division to order and consider a physical examination in accordance with Juv. R. 30 and R.C. § 2151.26.
On April 29, 1998, the Ohio Supreme Court affirmed the judgment of this Court of Appeals on the authority of State v. Golphin
(1998), 81 Ohio St.3d 543, 692 N.E.2d 608. In Golphin the Supreme Court held:
 The Court of Appeals did not err in concluding that the juvenile court failed to accomplish a legal transfer of its jurisdiction in that there is no evidence in the record that a physical examination of Golphin was performed as required by R.C. 2151.26 and Juv. R. 30. The court correctly recognized that the prosecution of Golphin in common pleas court was void ab initio. See State v. Wilson. It correctly reversed and remanded the cause to the common pleas court with instructions that the judgment of conviction against the defendant be vacated. Upon implementation of that mandate, the cause must then be further remanded to the juvenile court for adjudication of the matters raised in the delinquency complaint, including possible resumption of bindover procedures.
Pursuant to remand, the Paulding County Court of Common Pleas, Juvenile Division, ordered that Mindy Berenyi undergo a physical examination. On June 15, 1998, pursuant to Juv.R.30 and R.C. § 2151.26 the trial court held an amenability hearing. On June 17, 1998, after reviewing the evidence presented both at the current hearing and the previous hearing held in 1996, the trial court found that "Mindy Ann Berenyi is not amenable to care or rehabilitation" and "the safety of the community may require that Mindy Ann Berenyi be placed under legal restraint for a period extending beyond the child's majority" and once again granted the State's motion to transfer to the General Division and thereafter relinquished the jurisdiction of the Juvenile Division.
On July 10, 1998, Mindy Ann Berenyi was indicted on one count of aggravated murder, a violation of R.C. § 2903.01(A). The indictment included a gun specification. At her arraignment on July 17, 1998, Mindy entered a plea of not guilty and not guilty by reason of insanity to the count of aggravated murder and the gun specification contained therein.
On January 19, 1999, Mindy filed a motion to withdraw her plea of not guilty by reason of insanity and further stated that she intended to claim self-defense, as related to the "battered child syndrome" and consistent with the holding of State v. Nemeth
(1998), 82 Ohio St.3d 202.
Finally on June 1, 1999, after several continuances, the trial began. The court recessed for jury deliberations on June 10, 1999. On June 11, 1999, after deliberations had ceased and the jury had reached a verdict, the trial court was informed that one of the jurors had received an anonymous telephone call on the evening of June 10, 1999, with reference to the trial. After examining two of the jurors individually in chambers, in the presence of counsel, the court found that the extra-judicial communications were prejudicial and on June 16, 1999, the trial court ordered a mistrial.
On June 30, 1999, the trial court sua sponte ordered a change of venue pursuant to Crim.R. 18 "due to the extreme amount of media coverage received by the original trial herein". Further the court stated, "that a fair and impartial retrial cannot be held in this county". In a journal entry dated July 26, 1999, after having previously ordered change of venue for the retrial the trial court designated Allen County as the new county of venue.
Upon transfer to Allen County, the trial court issued a gag order to protect Mindy and the State of Ohio from prejudicial publicity that would deprive either party of a fair trial. On September 20, 1999, Mindy was retried for the aggravated murder of her father. On October 1, 1999, Mindy was found guilty of aggravated murder and of the gun specification contained therein. In a judgment entry dated October 5, 1999, the trial court sentenced Mindy to life in prison with parole eligibility after serving twenty (20) years of imprisonment.
On appeal from that judgment Mindy presents six assignments of error. The assignments of error will be addressed in chronological order of occurrence during trial.
 1. The court abused its discretion in finding that Appellant was not amenable to rehabilitation within the Juvenile Court system and ordered that jurisdiction be transferred to the General Division of the Paulding County Common Pleas Court for trial as an adult.
Mindy initially asserts that the Juvenile Division of the Paulding County Court of Common Pleas failed to follow the strict procedures mandated by R.C. § 2151.26 and Juv.R.30 before it transferred jurisdiction to the General Division.
Ohio statutory law permits a juvenile court to waive exclusivejurisdiction over any juvenile fifteen years old or older andtransfer said juvenile to the Court of Common Pleas forprosecution as an adult. R.C. 2151.26; Juv.R.30. "In making thisassessment, the juvenile court enjoys wide latitude to retain orrelinquish jurisdiction, and the ultimate decision lies within itssound discretion." State v. Watson (1989), 47 Ohio St.3d 93, 95,547 N.E.2d 1181 citing State v. Carmichael (1973), 35 Ohio St.2d 1,298 N.E.2d 568, paragraphs one and two of the syllabus, cert.denied (1974), 414 U.S. 1161, 94 S.Ct. 922, 39 L.E.2d 113.Therefore absent an abuse of discretion, we will not reverse adecision by the juvenile court to transfer a juvenile to the Courtof Common Pleas for prosecution as an adult. State v. Douglas
(1985), 20 Ohio St.3d 34, 36, 485 N.E.2d 711.
A juvenile court's authority to transfer cases to a court of common pleas is governed by R.C. 2151.26 and Juv.R.30. R.C.2151.26 provides in pertinent part:
 (A)(1)[A]fter a complaint has been filed alleging that a child is a delinquent child for committing an act that would constitute a felony if committed by an adult, the court at a hearing may transfer the case for criminal prosecution to the appropriate court having jurisdiction of the offense, after making the following determinations:
 (a)The child was fifteen years of age or older at the time of conduct charged;
 (b) There is probable cause to believe that the child committed the act alleged;
 (c) After an investigation, including a mental and physical examination of the child made by a public or private agency or a person qualified to make the examination, and after consideration of all relevant information and factors, * * * that there are reasonable grounds to believe that:
 (i) He is not amenable to * * * rehabilitation * * * in any facility designed for the care, supervision, and rehabilitation of delinquent children;
 The safety of the community may require that he be placed under legal restraint, including, if necessary, for the period extending beyond his majority.
Juv.R. 30 provides
 In any proceeding where the court may transfer a child of fifteen or more years of age for prosecution as an adult, the court shall hold a preliminary hearing to determine if there is probable cause to believe that the child committed the act alleged and that such act would be a felony if committed by an adult. * * *
 If the court finds probable cause, it shall continue the proceedings for full investigation. Such investigation shall include a mental and physical examination of the child * * * by a person qualified to make such examination. When the investigation is completed, a hearing shall be held to determine whether to transfer jurisdiction. * * *
The record reveals that on November 17, 1995, upon motion from the State the juvenile court ordered a preliminary hearing pursuant to Juv.R. 30 and R.C.2151.26 to determine if there was probable cause to believe that Mindy committed the act alleged, murder, and that such act would be a felony if committed by an adult. Thereafter on November 29, 1995 the trial court entered judgment finding probable cause and ordering the following:
 2. That pursuant to Juv.R. 30, the above proceedings are hereby continued for a full investigation.
 3. That as part of the full investigation, the child, Mindy Ann Berenyi, shall submit to both a mental examination and a physical examination with report of same to be made to the Court. The designation of the examiner and the site of the examination shall be by separate order of this Court.
After the investigation and a mental examination, the juvenile court relinquished jurisdiction and transferred Mindy to the general division for trial as an adult. After entering a plea of no contest to a lesser charge of murder and judgment and sentence was entered by the general division Mindy appealed the judgment and sentence to this Court. As previously stated this court reversed the judgment of the trial court because Mindy failed to undergo the physical examination mandated by Juv.R. 30 and R.C.2151.26. State v. Berenyi (Sep. 18, 1997) Paulding App. No 11-97-01, unreported. The Supreme Court of Ohio later affirmed that judgment. State v. Berenyi (1998), 81 Ohio St.3d 550.
Upon reversing the judgment of the Paulding County Court of Common Pleas and vacating Mindy's guilty plea this court held:
 "With the exception of properly conducting a physical examination of appellant, we find that the juvenile court complied with R.C. 2151.26 and Juv.R. 30 in deciding to bindover appellant's case. Therefore, we affirm the juvenile court's findings that there was probable cause that appellant killed her father, that she was not amenable to rehabilitation within the juvenile system, and that the safety of the community warranted binding over appellant's case for trial as an adult. However, because the record does not reflect that the juvenile court properly conducted a physical examination pursuant to R.C. 2151.26 and Juv.R. 30 before binding over appellant's case, we must remand this case back to the Paulding County Court of Common Pleas, Juvenile Division, for further proceedings consistent with this opinion."
Subsequently Mindy was returned to the custody of the juvenile authorities and the juvenile court ordered that she undergo a physical exam. On June 15, 1998, the trial court held a hearing pursuant to Juv.R. 30 and R.C. 2151.26 to determine if Mindy was amenable to transfer to the general division for trial as an adult.
The only evidence presented at the hearing was the testimony of Dr. Jay Nielsen. Dr Nielsen performed the physical exam on Mindy and testified that he found her to be in good health. On June 17, 1998 after reviewing the testimony of Dr. Nielsen and the evidence presented at the prior hearing conducted in March 1996, the trial court granted the State's motion to transfer jurisdiction and relinquished its jurisdiction over Mindy. The entry is in part:
 "The cause before the Court pursuant to a remand to this Court for further proceedings consistent with the Opinion and Judgment of the Court of Appeals of the Third Appellate District * * *
 In its opinion, the Court of Appeals specifically affirmed this Court's previous findings that there was probable cause that Mindy Ann Berenyi killed her father, that Mindy Ann Berenyi was not amenable to rehabilitation within the juvenile court system, and that the safety of the community warranted binding over Mindy Ann Berenyi's case for trial as an adult.
* * *
 Whereupon, evidence was presented regarding the physical examination of Mindy Ann Berenyi, and the Court finds from the evidence that Mindy Ann Berenyi is in good health, and her condition is excellent and stable, and further finds that the physical examination of Mindy Ann Berenyi does not indicate anything that would change or affect this Court's previous findings and determination that Mindy Ann Berenyi is not amenable to care or rehabilitation within the juvenile system and that the safety of the community may require that Mindy Ann Berenyi be placed under legal restraint for a period extending beyond the child's majority and her trial as an adult.
Mindy argues that because the only evidence presented at the hearing held in June 1998 was the testimony concerning her physical examination, the juvenile court once again failed to follow the procedures mandated by Juv.R. 30 and R.C. 2151.26. Moreover, she argues that the court was in error when it relied on the evidence presented at the March 1996 amenability hearing because the evidence was slanted and prejudiced. We do not agree.
Pursuant to and in accordance with the remand of this court the juvenile court ordered and considered the results of Mindy's physical examination. The record also reveals that the juvenile division, upon notification of completion of the physical examination, held a hearing to determine the status of Mindy's physical condition and capacity for transfer to the general division for trial as an adult. The evidence presented established that Mindy was in "excellent and stable condition". The court before granting the motion to transfer determined that the positive results of the physical examination did not affect its previous findings, but instead gave additional weight to its decision to relinquish jurisdiction over Mindy and transfer her to the general division for trial as an adult.
Further this court held in State v. Berenyi (Sept. 18, 1997), Paulding App. No. 11-97-01, unreported, that the juvenile court, considering all the evidence presented at the March 1996 hearing, did not abuse its discretion in transferring Mindy to the general division for trial as an adult. It naturally follows then that absent any evidence that the trial court abused its discretion by ordering the physical examination in accordance with the remand of this court and Juv.R. 30 and R.C.2151.26, this court is precluded from finding that the juvenile court abused its discretion in transferring jurisdiction.
Mindy has pointed to nothing in the record on appeal to show that the trial court abused its discretion in ordering the physical exam or in its consideration of the subsequent results at the amenability hearing in June 1998. To the contrary, the record reveals that the trial court not only ordered a physical exam but also, held a hearing at which the results of the physical exam were presented and their veracity verified. In addition, the trial court not only weighed the results of that physical exam but also considered the prior evidence produced from the investigation ordered in November 1995 and presented at the March 1996 hearing. Therefore, no abuse of discretion having been shown, Mindy's first assignment of error is overruled.
 2. A judgment or conviction rendered by a court lacking jurisdiction is void ab initio, and as a result, the indictment against the appellant should be dismissed pursuant to the provisions of R.C.2945.71
 3. Appellant was denied her right to a speedy trial in violation of the Sixth and Fourteenth amendments to the United States Constitution and Article I, Section 10, of the Ohio Constitution when she was not brought to trial within a reasonable time following the vacating by the Court of Appeals of her first conviction.
The second assignment of error is merely rhetorical but together with the third assignment of error addresses the issue of Mindy's right to a speedy trial under the Federal and Ohio Constitutions. Therefore, we address them together. Mindy asserts two separate arguments under these assignments of error.
Initially Mindy claims that because this court vacated the judgment entered by the trial court finding Mindy guilty of murder in September 1997 and remanded the case to the Juvenile Division for a physical examination in accordance with Juv.R.30 and R.C.2151.26, her waiver of her right to a speedy trial at the general division was also void and thus, when she was finally brought to trial in June of 1999 for the first time her speedy trial rights had been violated because she was initially indicted in June 1996. Thus, Mindy concludes the General Division erred by entering judgment against her in October 1999. Mindy also claims that the time between her bindover to the general division on June 17, 1998 and her trial in June 1999 exceeded the time allotted under R.C.2945.71 for trial and therefore violated her right to a speedy trial under the Ohio and Federal Constitutions.
An accused is guaranteed the right to a speedy trial by theSixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution. To determine whether an accused's right to a speedy trial has been violated, the United States Supreme Court has devised a balancing test which requires courts to balance and weigh the conduct of the prosecution and that of the accused by examining four factors: the length of the delay, the reason for the delay, whether the accused has asserted his speedy trial rights, and any resulting prejudice to the accused. Barker v. Wingo (1972), 407 U.S. 514, 92 S.Ct. 2182,33 L.Ed.2d 101.
Ohio has enacted statutes which establish the time limitswithin which the accused must be brought to trial followingarrest. R.C. 2945.71(C)(2). The statutory speedy trial periodsdo not apply to retrials, but nevertheless serve as a usefulguideline to determine a "reasonable time" for constitutionalspeedy trial purposes. State v. Fanning (1982), 1 Ohio St.3d 19,437 N.E.2d 583.
In determining whether Mindy's speedy trial rights were violated by the delay between her bindover in June 1998 and her trial in June 1999 it is appropriate to apply the guidelines set forth in R.C. 2945.71
 R.C. 2945.71(C)(2) requires that a person charged with a felonymust be brought to trial within 270 days after his arrest. Whencomputing time under R.C. 2945.71(C)(2) "each day during which theaccused is held in jail in lieu of bail on the pending chargeshall be counted as three days." R.C. 2945.71(E). Also it shouldbe noted that a time for speedy trial begins to run the day aftera juvenile court relinquishes jurisdiction. State ex rel. Williamsv. Court of Common Pleas (1975), 42 Ohio St.2d 433, 435,329 N.E.2d 680.
The provisions of R.C. 2945.71 et seq. are mandatory and must be strictly complied with by the trial court. State v. Pudlock
(1975), 44 Ohio St.2d 104 However, R.C. 2945.72 provides a list of limited exceptions to the strict mandates of the speedy trial. It provides:
 "The time within which an accused must be brought to trial, or in the case of felony, to preliminary hearing and trial, may be extended only by the following:
 (B) Any period during which the accused is mentally incompetent to stand trial or during which his mental competence to stand trial is being determined * * *
 (H) The period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion."
 There is no per se definition of what constitutes a"reasonable" delay. State v. Saffell (1988), 35 Ohio St.3d 90,518 N.E.2d 934. "Resolution of such a question depends on thepeculiar facts and circumstances of a particular case." Id. at 91.
It is well settled that a "court speaks only through its journal entries". State v. King (1996), 70 Ohio St.3d 158,637 N.E.2d 903. It follows then that since a court "may only speak through its journal, it is necessary that such an entry be spread upon its journal prior to the expiration of the statutory time limit." State v. Mincy (1982), 2 Ohio St.3d 6, 8, 441 N.E.2d 571.
The journal entries contained within the record reflect that the juvenile court relinquished jurisdiction and transferred Mindy to the general division for trial as an adult on June 17, 1998. Mindy was indicted on July 10, 1998. On July 17, 1998, at her arraignment Mindy entered a plea of not guilty and not guilty by reason of insanity to the count of aggravated murder and the gun specification contained therein. On July 17, 1998, the trial court ordered the Diagnostic and Treatment Center of Toledo, Ohio to conduct an evaluation of Mindy's mental condition at the time of the commission of the alleged aggravated murder pursuant to her plea of not guilty by reason of insanity.
On September 21, 1998, after receipt of the psychological evaluations ordered by the court in July, the trial court assigned the case for trial by jury on October 13, 1998. On October 9, 1998, Mindy moved for a continuance of the trial claiming inadequate time to prepare for trial. The court granted the motion and continued the trial until January 19, 1999. On January 19, 1999, Mindy filed a motion to withdraw her plea of not guilty by reason of insanity and further stated that she intended to claim self-defense, as related to the "battered child syndrome" and further she requested that the trial date be vacated and rescheduled. On January 25, 1995, the trial court granted Mindy's motion for a continuance and rescheduled the trial for April 19, 1999.
On April 9, 1999, the State filed a motion for continuance of the trial scheduled for April 19, 1999. The State requested the continuance because "defense counsel ha[d] not supplied the State with the Psychological Evaluation from their expert witness, Dr. Quinn as of this date." Moreover, the State claimed that on January 19, 1999, that court had ordered that all evaluations be submitted not later than March 19, 1999 and thus the delay should not be charged to the State under R.C. 2945.71. The trial court granted the State's motion and continued the trial to Monday May 10, 1999.
On April 27, 1999, the state filed a motion to continue the jury trial then scheduled for May 10, 1999, because the State's expert witness would be on vacation and the State still had not received a completed evaluation from the defendant per the court's January 19, 1999 order. The trial court granted the State's motion and continued the trial to Tuesday June 1, 1999. The trial commenced on June 1, 1999.
Mindy claims that because she spent the entire time in jail from the date of transfer of jurisdiction until the date of trial in June 1999 the State failed to bring her to trial in ninety (90) days as required. She argues that the State did not bring her to trial for one hundred sixty three (163) days. In her calculation Mindy did not count the days between her July 17, 1998 entry of plea and the withdrawal of the plea claiming not guilty by reason of insanity on January 19, 1999. However, Mindy counted one hundred and thirty three (133) days between her January 19, 1999 withdrawal of the guilty plea and the trial on June 1, 1999. Mindy has miscalculated the time remaining after credit for the time tolled pursuant to R.C. 2945.72.
The time for trial under R.C. 2945.71 began to run on June 18, 1998, the day after Mindy was transferred to the general division for trial as an adult. Twenty-nine (29) days passed before the trial court ordered that Mindy's mental state be evaluated by a physician pursuant to her plea of not guilty by reason of insanity. The reports were received on September 21, 1998 and the case was set for trial in October. Under R.C. 2945.72(B) the time necessary to determine Mindy's mental state tolls the time under R.C. 2945.71.
Following the scheduling of trial for October 13, 1998, Mindy filed two motions to continue the trial and it was finally rescheduled for April 19, 1999. Pursuant to R.C. 2945.72, the time within which Mindy must be brought to trial under R.C. 2945.71 is tolled. The State then proceeded to file two motions to continue the trial due to the failure of the defense to produce its mental evaluations and the absence of one of its expert witnesses. The trial court granted these motions and found that the delays were reasonable and thus "shall not be charged against the State of Ohio for purposes of computation of time for trial" under R.C. 27945.72(H).
Therefore after a thorough review of the judgment entries in the record, applying the guidelines set forth by R.C. 2945.71 and its exceptions in 2945.72, all time after the July 17, 1998 order for mental evaluations of Mindy was tolled and thus only twenty nine (29) days elapsed between the time Mindy was transferred from the juvenile division to the general division for trial as an adult on June 17, 1998, and the actual trial on June 1, 1999. Because the State is allotted 90 days in which to bring Mindy to trial under R.C. 2945.71, Mindy has failed to show that an unreasonable time has elapsed in bringing her to trial in violation of her right to a speedy trial. No error having been shown Mindy's second and third assignments of error are overruled.
 4. Appellant was denied her right to due process of law and a fair trial by the court's admission of expert testimony that was based on a lack of personal knowledge of the data underlying the opinion.
In her fourth assignment of error Mindy claims that the trial court erred by admitting parts of the testimony of Dr. McIntyre, an expert witness for the State. Mindy argues that Dr. McIntyre's testimony regarding evaluations of Mindy's mental state prepared by Dr. Smalldon violated Evid.R. 703, as the evaluations were not prepared by Dr. McIntyre and were thus, outside of her personal knowledge.
Evid.R. 703 states:
 The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by him or admitted in evidence at the hearing.
 Generally, the decision to allow expert testimony is within thesound discretion of the trial court and will not be overturnedabsent a showing that the trial court abused its discretion.State v. Biros (1997), 78 Ohio St.3d 426, 452, 678 N.E.2d 891.Under Evid.R. 703, an expert witness must base his testimony onfacts within his own personal knowledge or upon facts shown byother evidence. State v. Chapin (1981), 67 Ohio St.2d 437,424 N.E.2d 317, paragraph two of the syllabus.
In Chapin, the Ohio Supreme Court held that a psychiatrist, testifying as an expert witness, could not offer opinion testimony when his conclusions were based upon writings which he did not prepare and which were not admitted into evidence. There was no indication that the psychiatrist called to testify ever personally examined the defendant. In State v. Solomon (1991), 59 Ohio St.3d 124,570 N.E.2d 1118, expert psychiatric testimony was offered by witnesses who based their evaluations on their own examinations as well as reports not admitted into evidence. The court held at the syllabus:
 Where an expert bases his opinion, in whole or in major part, on facts or data perceived by him, the requirement of Evid.R. 703 has been satisfied.
The record reveals that Dr. McIntyre testified during the rebuttal portion of the State's case. Dr. McIntyre's testimony was offered for the sole purpose of rebutting the testimony offered by Dr. Smalldon, that Mindy suffered from the "battered child syndrome". Dr McIntyre testified that she had purposely not given Mindy a MMPI-2 (Minnesota Multiphasic Personality Inventory-2 Test) before her interview because Mindy had taken the test five times and Dr. McIntyre did not feel another was necessary.[1]
Further Dr. McIntyre testified that in performing the MMPI-2 test Dr. Smalldon had used incorrect parameters in grading the test. Specifically, Dr. McIntyre testified that Dr. Smalldon had scored the test as if Mindy was "in voluntary outpatient treatment". As a result, Dr. McIntyre, using the same answers supplied by Mindy on the original test administered by Dr. Smalldon changed the parameters to a "correctional" or "forensic" setting, meaning that the test-taker is incarcerated. The test was re-scored according to the new parameters and the results were different. Dr. McIntyre testified to the new results and her opinion of the correctness of those results when combined with the observations gained from her personal interview with Mindy. Dr. McIntyre's revised test results were admitted into evidence as State's Exhibit 46.
The portions of the record outlined above reveal that Dr. McIntyre testified to a report prepared by her using parameters different from those applied by Dr. Smalldon and that her report was admitted evidence. Further, the record reveals that Dr. McIntyre, in addition to the preparation of her report, interviewed Mindy personally before the trial in June 1999 concerning her state of mind at the time she shot her father in September 1995. Thus, the record supports the proposition that Dr. McIntyre did indeed testify to facts or data perceived by her and admitted. Therefore her testimony was given in accordance with the guidelines of Evid.R.703 as interpreted by the Supreme Court. No abuse of discretion having been shown, Mindy's fourth assignment of error is overruled.
 5. The trial court erred in admitting the rebuttal testimony of the State's witnesses.
In her fifth assignment of error Mindy argues that the trial court erred by admitting the rebuttal evidence offered by the State because the testimony of its rebuttal witnesses, with the exception of Dr. McIntyre's, failed to refute any new evidence offered by Mindy in her presentation of her case in defense.
Rebuttal evidence has been defined as "that which is given toexplain, repel, counteract, or disprove facts given in evidence bythe adverse party," Nickey v. Brown (1982), 7 Ohio App.3d 32,454 N.E.2d 144[454 N.E.2d 177]; "it becomes relevant only tochallenge the evidence offered by the opponent, and its scope islimited by such evidence." State v. McNeill (1988),83 Ohio St.3d 438, 446, 700 N.E.2d 596, 605, U.S. cert. denied___ U.S. — ___, 119 S.Ct. 1792, 143 L.Ed.2d 1019. It is wellestablished that "[a] party has an unconditional right to presentrebuttal testimony on matters that are first addressed in anopponent's case-in-chief and should not be brought in therebutting party's case-in-chief." Phung v. Waste Mgmt., Inc.(1994), 71 Ohio St.3d 408, 410, 64 N.E.2d 286[644 N.E.2d 286],289, citing Katz v. Enzer (1985), 29 Ohio App.3d 118,504 N.E.2d 427.
Admission of rebuttal testimony is a matter within the sound discretion of the trial court and its judgment will not be reversed absent a clear showing of an abuse of that discretion with attendant material prejudice to the defendant. State v.Hymore (1967), 9 Ohio St.2d 122, 128, 224 N.E.2d 126, 130. Thus, a trial court's decision regarding the admission of rebuttal testimony will not be reversed unless the trial court's decision was unreasonable, arbitrary or unconscionable. State v. Finnerty
(1989), 45 Ohio St.3d 104, 108, 543 N.E.2d 1233, 1237.
The record reveals that after the State rested, Mindy presented her evidence hoping to establish that she had acted in self-defense in consequence of her suffering the battered child syndrome. In doing so, she not only introduced the testimony of several expert witnesses but also introduced the testimony of several witnesses who testified that Andy had a history of physically abusing, not only Mindy but also other people in his life including his ex-wife and his two sons.
After the defense rested the State offered the testimony of: Dr. Charles Clark, Dr. Barbara McIntyre, James E. Miller, Rebecca Geyer, Ernie Longberry, Ashley Longwell, Steven Berenyi, Scott Berenyi, Patricia Kammeyer, Jody Kammeyer, Steve Hitzeman, and Joni Berenyi. A careful review of their testimony reveals that Doctors Clark and McIntyre testified to rebut Mindy's claim that she was a "battered child", first introduced in the case in chief.
In her defense Mindy presented several witnesses who testified that Andy Berenyi was predisposed to physically and mentally abusing his family members and friends. Thereafter, each of the States' rebuttal witnesses testified to the contrary.
Applying the principles enunciated above to the foregoing evidence presented by the record, we do not find that the decision of the trial court to admit the rebuttal testimony offered by the state was arbitrary, unconscionable or unreasonable. Therefore, no error having been shown, Mindy's fifth assignment of error is overruled.
 6. The evidence presented at trial fails to meet the prior calculation and design standard required by R.C. 2903.01
In her final assignment of error Mindy claims that the State failed to establish that Mindy shot Andy with prior calculation and design and thus, the evidence was insufficient to support the verdict convicting her of aggravated murder. Specifically, Mindy claims that the state failed to present evidence of a calculated and planned killing as contemplated by the aggravated murder statute. Instead Mindy claims that the only evidence presented by the State established that Mindy made an instantaneous decision to shoot her father and that type of killing is not the type included within the aggravated murder statute.
Initially, we observe that "on the trial of a case, either civil or criminal, the weight to be given credibility of the witnesses are primarily for the trier of facts." State v. DeHass
(1967), 10 Ohio St.2d 230, paragraph one of the syllabus. "Sufficiency is a term of art meaning that the legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." State v. Thompkins (1997), 78 Ohio St.3d 380,382.
When a defendant challenges the sufficiency of evidence, we determine "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259,574 N.E.2d 492, paragraph two of the syllabus, following Jackson v.Virginia (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. To reverse a judgment of a trial court when there is insufficient evidence to support it, only a concurring majority of a panel of a court of appeals reviewing the judgment is necessary. Id.
Aggravated murder is a violation of R.C. § 2903.01. Which states in part:
 (A) No person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy.
The committee comments to the foregoing section explain in pertinent part:
 "The first part of this section restates the former crime of premeditated murder so as to embody the classic concept of the planned, cold-blooded killing while discarding the notion that only an instant's prior deliberation is necessary. By judicial interpretation of the former Ohio law, murder could be premeditated even though the fatal plan was conceived and executed on the spur of the moment. See State v. Schaffer, 133 Ohio App. 125[113 Ohio App. 125], 17 O.O.2d 114, 177 N.E.2d 531 (Lawrence Co. App. 1960). The section employs the phrase, "prior calculation and design," to indicate studied care in planning or analyzing the means of the crime, as well as a scheme compassing the death of the victim. Neither the degree of care nor the length of time the offender takes to ponder the crime beforehand are critical factors in themselves, but they must amount to more than momentary deliberation."
The Ohio Supreme Court has stated that there is no bright line test to determine the presence or absence of prior calculation and design. State v. Taylor (1997), 78 Ohio St.3d 15. "Instead, each case turns on the particular facts and evidence presented at trial." Id. at 20. Moreover, "[w]here evidence adduced at trial reveals sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified." State v. Poole
(1996), 116 Ohio App.3d 513, 527.
The Eighth District Court of Appeals found several factors important in determining whether prior calculation and design may be found. It stated in part:
 "Some of the important factors to be examined and considered in deciding whether a homicide was committed with prior calculation and design include: whether the accused knew the victim prior to the crime, as opposed to a random meeting, and if the victim was known to him whether the relationship and been strained; whether thought and preparation were given by the accused to the weapon he used to kill and/or the site on which the homicide was to be committed as compared to no such thought or preparation; and whether the act was drawn out over a period of time as against an almost instantaneous eruption of events."
 State v. Jenkins (1976), 48 Ohio App.2d 99, 102-103,355 N.E.2d 825.
The record reveals that several witnesses including Mindy herself testified that she had a strained relationship with her father. The evidence presented included testimony that Mindy became rebellious, snuck out of the family home at night, began smoking cigarettes, drank alcoholic beverages, used marijuana regularly, stole her father's car and ran away from home.
Further the record reveals that Mindy knew where her father kept his guns; Mindy broke into her father's room to retrieve a weapon; Mindy sat in the bathroom adjacent to the kitchen door where her father normally entered the home instead of going to a bathroom in the back of the house; Despite the fact that there were no messages on the answering machine upon hearing her father enter the kitchen Mindy called to Andy to check the answering machine thus manipulating Andy into standing directly in front of the bathroom door where she was waiting with a gun; Finally, numerous witnesses testified that previously Mindy had threatened numerous times to kill her father.
The evidence presented at trial reveals that Mindy had time to reflect about her actions and decide whether or not to kill her father. Mindy sat in the bathroom adjacent to the kitchen for at least an hour and contemplated her actions before Andy arrived home from work and she shot him. Therefore, viewing the foregoing evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found the essential elements of the "prior calculation and design" standard proven beyond a reasonable doubt.
No error having been shown Mindy's final assignment of error is overruled and the judgment of the Court of Common Pleas of Allen County is affirmed.
 _________________________ Bryant, J.
 HADLEY, P.J. and WALTERS, J., concur.
[1] Doctor McIntyre testified that Mindy Berenyi had taken the MMPI test five times before her interview because it had been given to her by all of the previous physicians who interviewed her. Further, Doctor McIntyre noted that her responses to the questions as a result of the repeated testing were rather similar and would continue to be such had she given Mindy yet another exam. Moreover, Dr. McIntyre noted that because she was asked to evaluate Mindy's state of mind at the time of the murder the MMPI test given three years after the murder would be of no help in determining her state of mind at that time, however, it would help in determining her personality traits which she could observe in a personal interview of Berenyi and from the other five MMPI results. Not every MMPI test given to Mindy Berenyi was admitted into evidence.